[No. A077629. First Dist., Div. Four. Jan. 26, 1999.]

UNITED STATES GOLF ASSOCIATION, Plaintiff and Appellant, v.
ARROYO SOFTWARE CORPORATION, Defendant and Appellant.

608

610

COUNSEL

Joseph Michaelangelo Alioto; and James M. Dombroski for Plaintiff and Appellant.

Cooley Godward, Michael Traynor, Janet L. Cullum, Gretchen Stroud; Lewis & Trattner, Stephen M. Trattner; Mayer, Brown & Platt and Lee N. Abrams for Defendant and Appellant.

OPINION

McGUINESS, J.*—

Arroyo Software Corporation (Arroyo) appeals from a judgment enjoining it from misappropriating golf handicap formulas and service marks developed and owned by the United States Golf Association (USGA). Arroyo

*Presiding Justice of the Court of Appeal, First District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

contends the trial court erred in (a) refusing to bar USGA's lawsuit on the ground it was collaterally estopped by an earlier decision of the United States Court of Appeal for the Third Circuit involving USGA and a different defendant (*United States Golf Ass'n* v. *St. Andrews Systems* (3d Cir. 1984) 749 F.2d 1028 (*St. Andrews*)); (b) rejecting Arroyo's argument USGA's lawsuit is preempted by federal copyright law; and (c) granting summary adjudication for USGA on Arroyo's cross-complaint against USGA for unfair competition, tortious interference with prospective economic advantage, and violation of California antitrust laws. In a cross-appeal, USGA argues that the trial court committed reversible error by declining to award it costs. We affirm the judgment in all respects.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The USGA was founded in 1894. One of its chief contributions to the game of golf in the United States has been its development and maintenance since 1911 of the USGA handicap system (Handicap System), designed to enable individual golf players of different abilities to compete fairly with one another. Because permitting individual golfers to issue their own handicaps to themselves would inevitably lead to inequities and abuse, the peer review provided by authorized golf clubs and associations has always been an essential part of the Handicap System. Therefore, in order to protect the integrity and credibility of its Handicap System, the USGA has consistently followed a policy of only permitting authorized golf associations and clubs to issue USGA handicaps.

There is a virtually unlimited number of possible handicap formulas and as many different philosophies about whether an individual golfer's handicap should reflect the golfer's maximum or reasonable potential, lifetime or average performance, highest or most recent scores, or some combination of all these various measurements. Over the years, other organizations have developed and promoted different handicap formulas, and USGA itself has changed its own Handicap System in response to changes in the game.

In 1979, USGA assembled a handicap research team to investigate widespread criticisms of USGA's then-existing handicap formula. The research team invested approximately a decade and up to $2 million conducting intensive analysis and evaluation of the various factors involved in developing a more accurate and satisfactory Handicap System. As a result, the research team developed new handicap formulas (Formulas) designed to measure the overall difficulty of golf courses, compare individual golfers with other golfers of all abilities, take account of differences between

tournament and casual play, and adjust aberrant scores on individual holes. USGA subsequently adopted and implemented these new Formulas between 1987 and 1993. Together with the adoption of these new Formulas, USGA introduced several new terms as service marks to identify its revised Handicap System.[1] Three of these new service marks were "Handicap Index," "Course Handicap," and "Slope." USGA spent a substantial amount of money advertising and promoting these terms and service marks in connection with its new Formulas. As a result, the credibility and integrity of the Handicap System were reestablished, its good will was enhanced, and the new marks acquired secondary meanings with the general golfing public.

USGA permits any entity to use its Handicap System and handicap Formulas, free of charge, for the purpose of providing handicap computation services or software to any authorized public or private golf club or association utilizing the USGA Handicap System in connection with the issuance of an individual USGA Handicap Index to a golfer. However, before issuing such a USGA Handicap Index to any golfer, USGA requires an authorized golf club or association to post golf scores for peer review and consideration, and submit its computations to a golf committee for review and adjustments in accordance with USGA Formulas.

USGA has previously been involved in at least five different lawsuits involving companies and entities which sought to issue USGA handicaps directly to individual golfers using USGA Formulas and associated distinctive service marks, without the authorization or permission of USGA. In the first such case, *St. Andrews, supra,* 749 F.2d 1028, the Third Circuit Court of Appeal rejected USGA's lawsuit against a computer company for misappropriation of its Formulas. The *St. Andrews* decision, one of first impression under New Jersey law, was based on the federal court's determinations that: (a) a showing of direct competition between the plaintiff and the defendant was essential to any claim of misappropriation under New Jersey law; and (b) USGA had failed to make the required showing of direct competition between itself and the defendant in that case. On this basis, the federal circuit court held that USGA had no legally protectible interest in the handicap formula it was promulgating at that time, and its claim for misappropriation was legally insufficient because the computer company defendant was not in direct competition with USGA. (*St. Andrews, supra,* 749 F.2d at pp. 1034-1041.)

---

[1]Unlike a "trademark," which refers to a word, name, symbol or other device used to identify or distinguish *goods* (Bus. & Prof. Code, § 14207), a "service mark" is defined as "a mark used in the sale or advertising of *services* to identify the services of one person and distinguish them from the services of others." (Bus. & Prof. Code, § 14206, italics added.)

In 1987, three years after the Third Circuit rendered its decision in *St. Andrews*, USGA adopted its new Formulas, including the new Slope system and service marks. Thereafter, USGA was a party to four more lawsuits in which it claimed misappropriation of its Handicap System and related Formulas and service marks in opposition to competing claims of entities desiring to establish their right to use the Handicap System without USGA's permission. In each of these four cases, the respective court entered a judgment in favor of USGA determining that USGA had a proprietary interest in the Handicap System and its related Formulas and service marks, and barring the opposing entity from using the Formulas or marks without USGA's express consent for any purpose other than providing golf handicap computation services to golf clubs and associations utilizing the USGA Handicap System.[2] Unlike the *St. Andrews* case, the applicable state common law at issue in each of these cases did *not* require a showing of direct competition between USGA and the entity asserting a right to use the Handicap System as part of a claim of misappropriation.

Arroyo is a California corporation involved in the production of computer software. It is not a golf association or golf club, and is not authorized by USGA to issue USGA handicaps or Handicap Indexes. In 1991, Arroyo began marketing a computer software program for golfers known as "Eagle-Trak." Instead of developing its own handicapping formula, Arroyo appropriated the USGA Handicap System without USGA's permission, and incorporated the USGA Formulas in its EagleTrak software at little or no cost to itself for use in calculating handicap indexes for individual golfers. Contrary to USGA's requirements, Arroyo did not limit its sale of EagleTrak to golf associations and clubs utilizing the USGA Handicap System. Thus, unlike the USGA Handicap System, Arroyo's EagleTrak did not incorporate any

---

[2]The decisions are: United States Golf Association v. Data-Max, Inc. (Ill. Cir.Ct., July 21, 1989) 89-CH-04995; United States Golf Association v. International Golfers Club, Inc. (Tenn. Ch. Ct., Aug. 1, 1994) 103076-2; *International Golfers Club, Inc.* v. *United States Golf Association* (U.S.Dist. Ct., D.N.J., July 22, 1994) 93-3246; *Parsons Technology, Inc.* v. *United States Golf Association* (U.S. Dist. Ct., N.D.Iowa, Mar. 6, 1995) C93-318. Copies of these decisions, all unpublished, are in the record on appeal and were before the trial court below.

It is worth noting that in one of these cases, the same New Jersey federal district court judge whose opinion was subsequently affirmed by the court of appeals in *St. Andrews* *rejected* the very argument advanced by Arroyo in this case. Thus, in *International Golfers Club, Inc.* v. *United States Golf Association, supra,* 93-3246, United States District Judge Harold A. Ackerman rejected the claim of the International Golfers Club, Inc., that it should be permitted to use the Handicap System and Formulas without USGA's permission. In so doing, Judge Ackerman specifically rejected the golfers club's collateral estoppel argument based on the earlier *St. Andrews* decision, on the grounds that: (a) the Tennessee law involved in the 1994 case differed from the New Jersey law at issue in the 1984 case; and (b) the operative facts at issue, including USGA's Handicap System, Formulas and service marks, had changed in the interim.

means of obtaining peer review of handicap computations. Nevertheless, Arroyo used USGA's name and service marks in advertising, promoting and selling EagleTrak to the public.

Arroyo's use of the USGA name and service marks caused members of the public who purchased EagleTrak to assume, incorrectly, that (a) USGA had authorized Arroyo's use of the Handicap System, Formulas and service marks; (b) the EagleTrak software issued USGA Handicap Indexes to individual golfers who entered their golf scores in the software program; and (c) the handicap indexes generated by the EagleTrak software were official USGA Handicap Indexes. USGA repeatedly asked Arroyo to stop the unauthorized use of the Handicap System, Formulas and service marks. Arroyo refused to comply. In the belief that Arroyo's unauthorized use of its Handicap System, Formulas and service marks was causing confusion in the general public, impairing USGA's reputation and good will, and devaluing the substantial investment of time and resources USGA had made in developing and improving its Handicap System, USGA filed the instant action on December 9, 1993, claiming misappropriation, unfair competition, and false and misleading advertising. Arroyo filed a cross-complaint alleging unfair competition, violation of California antitrust law (the Cartwright Act, Bus. & Prof. Code, § 16720 et seq.), and tortious interference with prospective economic advantage.

On February 15, 1996, prior to trial, the trial court held USGA had the right to assert a claim for misappropriation under California law without a showing of direct competition between USGA and Arroyo, and this claim was not preempted by federal copyright law. Although the trial court concluded USGA had proffered substantial uncontroverted evidence to support its claim, it denied USGA's motion for summary adjudication on the ground there were some material facts in dispute. However, the trial court did grant USGA's motion for summary adjudication with respect to all three of the claims alleged in Arroyo's cross-complaint. In addition, the trial court entered an order granting USGA's motion for admission pro hac vice of two out-of-state attorneys who had been assisting local California counsel in the prosecution of USGA's lawsuit.

Shortly before trial, USGA amended its complaint to drop its claims for damages and attorney fees. On October 25, 1996, at the conclusion of the bench trial on USGA's claims for injunctive relief based on misappropriation, unfair competition and service mark infringement, the trial court filed a statement of decision finding that USGA had "amply met its burden" of proving Arroyo's conduct had violated USGA's proprietary rights in the

Handicap System, Formulas and service marks under the California common law of misappropriation. Specifically, the trial court found that Arroyo's unauthorized use of USGA's Formulas in the EagleTrak software "undermined" the integrity of the Handicap System, "thereby creating the substantial risk of damage to the reputation, standing and viability of the USGA." The trial court expressly rejected Arroyo's affirmative defenses of collateral estoppel and federal copyright preemption. In addition, the trial court found that the USGA service marks "USGA," "Handicap Index," "Slope," and "Course Handicap" were all protectible under the federal trademark law (the Lanham Act, 15 U.S.C. § 1051 et seq.) because they were either inherently distinctive or else had acquired secondary meanings through advertising. The trial court determined that Arroyo's unauthorized use of these service marks in its advertising, packaging and instructional materials created a likelihood of confusion by conveying to the general public that USGA had authorized and approved Arroyo's use of the Handicap System, and found that Arroyo's disclaimers were "ineffectual" and "ambiguous."

On the basis of its findings and conclusions, the trial court issued a permanent injunction prohibiting Arroyo from any unauthorized commercial use of the Handicap System, Formulas or service marks. The trial court refused to award costs to either party, finding on the basis of its equitable discretion that neither party had prevailed. Arroyo timely filed its notice of appeal from the judgment, and USGA cross-appealed from the trial court's denial of costs.

## II. COLLATERAL ESTOPPEL

Arroyo first argues that USGA is barred from relitigating the issues decided against it in *St. Andrews, supra,* 749 F.2d 1028, and that the trial court erred in rejecting Arroyo's affirmative defense of collateral estoppel on this basis. Arroyo is incorrect.

Collateral estoppel bars a party to an action, or one in privity, from subsequently relitigating issues actually litigated and finally decided against it in the earlier action. (*City of Sacramento* v. *State of California* (1990) 50 Cal.3d 51, 64 [266 Cal.Rptr. 139, 785 P.2d 522]; *Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865, 874 [151 Cal.Rptr. 285, 587 P.2d 1098]; *Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807, 811-813 [122 P.2d 892]; *Todhunter* v. *Smith* (1934) 219 Cal. 690, 695 [28 P.2d 916]; *Department of Industrial Relations* v. *Seaboard Surety Co.* (1996) 50 Cal.App.4th 1501, 1512 [58 Cal.Rptr.2d 532]; *McClain* v. *Rush* (1989) 216 Cal.App.3d 18, 29 [264 Cal.Rptr. 563]; 7 Witkin, Cal. Procedure (4th ed.

1997) Judgment, §§ 354-356, pp. 915-921.) A corollary of the rule that collateral estoppel is confined to issues "actually litigated" is the requirement that the issue decided previously be "identical" with the one sought to be precluded. (*People* v. *Taylor* (1974) 12 Cal.3d 686, 691 [117 Cal.Rptr. 70, 527 P.2d 622]; *Wimsatt* v. *Beverly Hills Weight etc. Internat., Inc.* (1995) 32 Cal.App.4th 1511, 1516-1517 [38 Cal.Rptr.2d 612]; *Harman* v. *Mono General Hospital* (1982) 131 Cal.App.3d 607, 614-615 [182 Cal.Rptr. 570]; 7 Witkin, Cal. Procedure, *supra*, Judgment, § 355, pp. 917-918.) Thus, a nonparty may invoke collateral estoppel against a party to a prior action only if three conditions are met: (1) the issue necessarily decided in the prior action is *identical* to the issue sought to be relitigated in the current action; (2) there was a final judgment on the merits in the previous action; and (3) the party against whom collateral estoppel is asserted was a party, or in privity with a party, to the previous suit. (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co.* (1986) 41 Cal.3d 903, 910 [226 Cal.Rptr. 558, 718 P.2d 920]; *Bernhard* v. *Bank of America, supra,* 19 Cal.2d at pp. 811-813; *Oro Fino Gold Mining Corp.* v. *County of El Dorado* (1990) 225 Cal.App.3d 872, 878 [274 Cal.Rptr. 720].)

Arroyo concedes that its collateral estoppel defense must fail unless the issues adjudicated by the Third Circuit 14 years ago in *St. Andrews* are identical to those in the instant case. It asserts that three issues decided against USGA in *St. Andrews* are identical to issues in this case and therefore controlling. These are: (1) the USGA Formulas are "functional"; (2) USGA cannot enjoin the use of its Formulas under the Lanham Act or under state law; and (3) common law misappropriation only applies to the use of the Handicap System Formulas by persons or entities in direct competition with USGA.

The difficulty with Arroyo's argument is that both the underlying facts and the applicable substantive law are different in this case from that before the Third Circuit in *St. Andrews*. ■ Collateral estoppel does not apply where there are changed conditions or new facts which did not exist at the time of the prior judgment, or where the previous decision was based on different substantive law. (*People* v. *Ocean Shore Railroad* (1948) 32 Cal.2d 406, 418-419 [196 P.2d 570, 6 A.L.R.2d 1179]; *Wimsatt* v. *Beverly Hills Weight etc. Internat., Inc., supra,* 32 Cal.App.4th at pp. 1516-1517 ["where the previous decision rests on a 'different factual and legal foundation' than the issue sought to be adjudicated in the case at bar, collateral estoppel effect should be denied"]; *Oro Fino Gold Mining Corp.* v. *County of El Dorado, supra,* 225 Cal.App.3d at pp. 878-880 [same]; *Bleeck* v. *State Board of Optometry* (1971) 18 Cal.App.3d 415, 428 [95 Cal.Rptr. 860] [same].) In

order to distinguish between "issues" and "legal theories," reference must be made to the pleadings and proof in each case. (*Clark* v. *Lesher* (1956) 46 Cal.2d 874, 880 [299 P.2d 865]; *Wimsatt* v. *Beverly Hills Weight etc. Internat., Inc., supra*, 32 Cal.App.4th at p. 1517; 7 Witkin, Cal. Procedure, *supra*, Judgment, §§ 355-359, pp. 917-925.) In this case, the decision in *St. Andrews* took place in a different legal context, as well as a different time and place from the instant action. Because both the underlying factual conditions and the substantive law at issue have changed from the time of the decision in *St. Andrews*, it cannot be said that the issues before the Third Circuit and the trial court below are "identical."

Between the time of the federal court decision in *St. Andrews* and the instant case, USGA completely changed its Handicap System by abandoning its older formula and developing the entirely new Formulas. The uncontroverted evidence adduced at trial establishes that the Formulas and service marks at issue in this case were not developed until 1987, three years *after* the decision in *St. Andrews*. The federal court had before it an older and completely different handicap formula. Soon after the decision in that case, USGA began the process of developing the more complex Formulas at issue here.[3] The evidence in the record fully supports the trial court's conclusion that as a result of "addressing and updating the basic approach to handicapping," through "the efforts of many people laboring for thousands of hours over more than two decades," and the expenditure of "millions of dollars in promoting the integrity of that system," USGA developed a "unique" Handicap System, such that the Formulas it employs "today are a far cry from the rudimentary form of score equalization used even 20 years ago. . . ." All of these changes to the underlying facts took place *after* the decision in *St. Andrews*, in which the federal circuit court concluded protection was unnecessary to protect USGA's incentive to create the relatively simple handicap formula in use at that time. (*St. Andrews, supra*, 749 F.2d at pp. 1040-1041.) Here, in contrast, substantial evidence supports the trial court's conclusion that "protection of the USGA handicapping 'business' is necessary to protect the basic incentive for the production of the idea or information involved. . . ."[4]

It is similarly well established that when the proceeding in which issue preclusion is currently sought involves different substantive law than the

---

[3]Judge Ackerman specifically noted this point in his 1994 decision denying collateral estoppel effect to the earlier *St. Andrews* decision and upholding the USGA's proprietary right to deny the use of its Handicap System, Formulas and service marks to all persons and entities aside from authorized golf clubs and associations. (*International Golfers Club, Inc.* v. *United States Golf Association, supra*, 93-3246.)

[4]On the Lanham Act trademark issue regarding the use of USGA's service marks, the Third Circuit only had one service mark before it (the name USGA). With regard to this service mark, the federal court only stated that the USGA "has an opportunity, if it wishes to exercise

previous proceeding, collateral estoppel does not apply. (*Atlantic C.L.R. Co. v. Engineers* (1970) 398 U.S. 281, 288-293 [90 S.Ct. 1739, 1743-1746, 26 L.Ed.2d 234]; *Wimsatt v. Beverly Hills Weight etc. Internat., Inc., supra,* 32 Cal.App.4th at p. 1517; *In re Nathaniel P.* (1989) 211 Cal.App.3d 660, 670-672 [259 Cal.Rptr. 555]; *Miller v. Johns-Manville Sales Corp.* (D.Kan. 1982) 538 F.Supp. 631, 632-634.) The controlling substantive law governing the instant case is different than that under which *St. Andrews* was decided by the Third Circuit.

Common law misappropriation is one of a number of doctrines subsumed under the umbrella of unfair competition. It is normally invoked in an effort to protect something of value not otherwise covered by patent or copyright law, trade secret law, breach of confidential relationship, or some other form of unfair competition. (*Montana v. San Jose Mercury News, Inc.* (1995) 34 Cal.App.4th 790, 793 [40 Cal.Rptr.2d 639]; *Balboa Ins. Co. v. Trans Global Equities* (1990) 218 Cal.App.3d 1327, 1342 [267 Cal.Rptr. 787]; *Slivinsky v. Watkins-Johnson Co.* (1990) 221 Cal.App.3d 799, 807 [270 Cal.Rptr. 585]; *Eastwood v. Superior Court* (1983) 149 Cal.App.3d 409, 417 [198 Cal.Rptr. 342].) ■ The elements of a claim for misappropriation under California law consist of the following: (a) the plaintiff invested substantial time, skill or money in developing its property; (b) the defendant appropriated and used the plaintiff's property at little or no cost to the defendant; (c) the defendant's appropriation and use of the plaintiff's property was without the authorization or consent of the plaintiff; and (d) the plaintiff can establish that it has been injured by the defendant's conduct. (*Balboa Ins. Co. v. Trans Global Equities, supra,* 218 Cal.App.3d at p. 1342; *Eastwood v. Superior Court, supra,* 149 Cal.App.3d at p. 417.)

The principal basis for the decision of the Third Circuit in *St. Andrews* was the fact that New Jersey law required proof of direct competition between the plaintiff and the defendant as an essential element of any misappropriation claim. (*St. Andrews, supra,* 749 F.2d at pp. 1038-1039 & fn. 17.) Under the California law applicable here, on the other hand, the essential elements of a misappropriation claim simply do not include any such requirement of proof of direct competition between the plaintiff and the defendant. (*Balboa Ins. Co. v. Trans Global Equities, supra,* 218 Cal.App.3d at p. 1342.) Because California law does not require a showing of direct competition between the parties before conduct otherwise constituting misappropriation

it, of offering . . . other companies the use of the U.S.G.A. name in marketing [their] products and services." (*St. Andrews, supra,* 749 F.2d at p. 1041.) Thus, although the Third Circuit did not directly address the service mark issue, it implied that the only service mark before it (the USGA name) was proprietary to USGA, and therefore *protectible.*

can be prohibited, the trial court was correct in holding both that the issues decided under New Jersey law in *St. Andrews* were not identical to those arising under California law in this case, and that collateral estoppel does not preclude USGA's claims in this case.[5]

Arroyo also contends that USGA is collaterally estopped from protecting its new Formulas because the *St. Andrews* court found that USGA's then-existing handicap formula was "functional," and therefore could not be protected under state or federal trademark law. (*St. Andrews, supra,* 749 F.2d at pp. 1032-1034.) Arroyo's claim fails for several reasons. First, as discussed, the facts have changed. The new Formulas at issue in this case are totally different than the old formula at issue in *St. Andrews.* Because the facts and conditions at issue have changed, the issue is not "identical," and collateral estoppel does not apply. Second, the *St. Andrews* court ruled that USGA could not protect its then-existing handicap formula because the formula was "functional" under the federal Lanham Act. That ruling was entirely separate from the federal court's analysis of USGA's misappropriation claim under New Jersey law. In this case, USGA has not attempted to protect the Formulas under the Lanham Act. USGA's current Lanham Act claims are aimed solely at Arroyo's unauthorized use of USGA's service marks. Thus, the *St. Andrews* court's decision regarding the "functionality" of the then-existing USGA formula for Lanham Act purposes is entirely irrelevant to the instant case, and has no collateral estoppel effect whatsoever.

 In short, both the operative facts and the controlling law in this case are significantly different from those on which the federal court decision in *St. Andrews* was based. Because the previous decision of the Third Circuit in *St. Andrews* was based on a different factual and legal foundation than the claims USGA seeks to adjudicate in this action, the trial court did not err in refusing to give the decision in the earlier federal case collateral estoppel effect.

## III. PREEMPTION

 Next, Arroyo contends the trial court erred in rejecting its argument that USGA's claims are preempted by federal copyright law. Arroyo is again incorrect.

[5]Once again, Judge Ackerman's principal basis for denying preclusive effect to the earlier *St. Andrews* decision was that Tennessee law, under which the later case was decided, was different from the New Jersey law under consideration in *St. Andrews.* (*International Golfers Club, Inc.* v. *United States Golf Association, supra,* 93-3246.)

■ The preemption doctrine derives from the supremacy clause of the United States Constitution. (U.S. Const., art. VI, § 2.)[6] In addressing a question of preemption, we start with the presumption that the historic police powers of the states are not to be superseded by federal law unless there is a clear and manifest purpose on the part of Congress to do so. (*Cipollone* v. *Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [112 S.Ct. 2608, 2617, 120 L.Ed.2d 407]; *Smiley* v. *Citibank* (1995) 11 Cal.4th 138, 148 [44 Cal.Rptr.2d 441, 900 P.2d 690].)

The 1976 Copyright Act (the Act) constituted the first major revision of federal copyright law since 1909. (17 U.S.C. § 101 et seq.) Under the Act, the owner of a copyright has the "exclusive rights" to reproduce the copyrighted work in copies; prepare derivative works based upon the copyrighted work; distribute copies of the copyrighted work to the public; and, in the case of appropriate artistic works, display or perform the copyrighted work publicly. (17 U.S.C.[7] § 106.)

The "subject matter of copyright" is set out in sections 102 and 103 of title 17. Section 102(a) provides that copyright protection "subsists" in "original works of authorship fixed in any tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated . . . ." The statute enumerates eight specific "categories" of works as included within the term "works of authorship."[8] Section 102(b) specifically *excludes* from copyright protection "any idea, procedure, process, system, method of operation, concept, principle, or discovery . . . ."[9] Section 103 extends "[t]he subject matter of copyright as specified by section 102" to

[6]United States Constitution, article VI, section 2, provides: "This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding."

[7]Unless otherwise noted, all further statutory references are to title 17 of the United States Code.

[8]Section 102(a) provides: "Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories: [¶] (1) literary works; [¶] (2) musical works, including any accompanying words; [¶] (3) dramatic works, including any accompanying music; [¶] (4) pantomimes and choreographic works; [¶] (5) pictorial, graphic, and sculptural works; [¶] (6) motion pictures and other audiovisual works; [¶] (7) sound recordings; and [¶] (8) architectural works."

[9]Section 102(b) provides: "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."

"compilations and derivative works" employing "preexisting material." (*Feist Publications, Inc.* v. *Rural Tel. Service Co.* (1991) 499 U.S. 340, 355-356 [111 S.Ct. 1282, 1292-1293, 113 L.Ed.2d 358].)

Although the Act preempts all state *copyright* law, it does not preempt all state common law protecting intellectual property. On the contrary, the Act expressly excludes some state common law claims from its preemptive sweep. The preemption provisions of the Act are set out in section 301. Section 301(a) provides that a state common law claim is preempted by the Act if (1) the state legal or equitable rights at issue "are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106" of title 17, and (2) the work of authorship in question is "fixed in a tangible medium of expression" and comes "within the subject matter of copyright as specified by sections 102 and 103" of title 17.[10] Section 301(b) then specifically *excludes* from preemption "any rights or remedies under the common law or statutes of any State" dealing with "subject matter that *does not* come within the subject matter of copyright as specified by sections 102 and 103, including works of authorship not fixed in any tangible medium of expression," and "activities violating [State] legal or equitable rights that *are not equivalent* to any of the exclusive rights within the general scope of copyright as specified by section 106." (Italics added.)[11]

■ USGA's common law claims are not preempted by federal copyright law because none of the prerequisites for preemption apply in this case. Thus, (1) the Handicap System and Formulas are not works of authorship that come within the subject matter of copyright; and (2) the state common law misappropriation rights at issue are not equivalent to any of the exclusive rights granted by the Act.

---

[10]Section 301(a) provides: "On or after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State."

[11]Section 301(b) provides: "Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to— [¶] (1) subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103, including works of authorship not fixed in any tangible medium of expression; or [¶] (2) any cause of action arising from undertakings commenced before January 1, 1978; [¶] (3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106; or [¶] (4) State and local landmarks, historic preservation, zoning, or building codes, relating to architectural works protected under section 102(a)(8)."

First, as Arroyo concedes, state common law claims seeking to protect subject matter not copyrightable under the Act are not preempted. (*Fleet* v. *CBS, Inc.* (1996) 50 Cal.App.4th 1911, 1918-1922 [58 Cal.Rptr.2d 645]; *Balboa Ins. Co.* v. *Trans Global Equities, supra,* 218 Cal.App.3d at pp. 1336-1337, 1345, 1353 & fn. 34; *A&M Records, Inc.* v. *Heilman* (1977) 75 Cal.App.3d 554, 560 & fn. 6 [142 Cal.Rptr. 390]; *Waits* v. *Frito-Lay, Inc.* (9th Cir. 1992) 978 F.2d 1093, 1100.) The question whether a work is within the subject matter of copyright is determined by sections 102 and 103. Section 103 deals solely with compilations and derivative works, and is clearly inapplicable to the Handicap System or Formulas. Similarly, the Handicap System and Formulas could not be made to fit within any of the eight specific categories of "original works of authorship" enumerated in section 102(a).

Arroyo bases its entire argument on section 102(b). This provision specifically *excludes* from copyright protection "any idea, procedure, process, system, method of operation, concept, principle, or discovery," codifying the well-established rule that "processes" and "systems" do *not* come within the general categories of copyrightable subject matter. (*Feist Publications, Inc.* v. *Rural Tel. Service Co., supra,* 499 U.S. at pp. 355-356 [111 S.Ct. at pp. 1292-1293].) In the course of this litigation, Arroyo specifically admitted that a golfing handicap formula "is not the type of subject matter that can receive copyright protection." This fact was also acknowledged by the Third Circuit in *St. Andrews,* which itself held that golf handicap formulas are noncopyrightable subject matter, and that state common law misappropriation claims seeking to protect such formulas are therefore *not* preempted by federal copyright law. (*St. Andrews, supra,* 749 F.2d at p. 1036 & fn. 14.)

Arroyo nevertheless now insists that *because* the USGA Formulas at issue constitute a "process" or "system," they should be made "available to all" without any limitations on free public access. Arroyo makes this assertion based on the unsupportable assumption that because section 102(b) excludes processes and systems from copyright protection, Congress must have wanted such processes and systems to be free of *all* laws restraining their use. Arroyo's argument conveniently ignores the rest of the Act. As seen, section 301(b) expressly states that the Act does *not* preempt any rights under state law with respect to protection of works of authorship not within the subject matter of copyright. Arroyo's interpretation of section 102(b) cannot be reconciled with this language of section 301(b), which clearly *preserves* state common law claims seeking protection for such works "not within the subject matter of copyright." Because, as Arroyo admits, golf handicap formulas are not a type of "subject matter" for which copyright

protection is available, the Act necessarily does *not* preempt a common law misappropriation claim with respect to such a golf handicap formula. (*Balboa Ins. Co.* v. *Trans Global Equities, supra,* 218 Cal.App.3d at p. 1345, 1353 & fn. 34; *St. Andrews, supra,* 749 F.2d at p. 1036 & fn. 14.)

Arroyo's preemption defense fails for the additional reason that USGA's common law misappropriation claim does not involve a right "equivalent to any of the exclusive rights within the general scope of copyright." (§§ 301(a), 301(b).) What USGA sought, and what the trial court ordered, was an injunction preventing Arroyo from *using* the USGA Formulas or misappropriating them as Arroyo's own. USGA's common law misappropriation claim did not seek to bar Arroyo from simply copying the Formulas. "Use" and "appropriation" are not among the "exclusive rights" granted copyright owners under the Act. Copying is an exclusive right protected under the Act; use is not. (§ 106; *Capitol Records, Inc.* v. *Erickson* (1969) 2 Cal.App.3d 526, 528-537 [82 Cal.Rptr. 798, 40 A.L.R.3d 553]; *G.S. Rasmussen & Assoc.* v. *Kalitta Flying Service* (9th Cir. 1992) 958 F.2d 896, 904-905.) Because use or appropriation are not equivalent to the exclusive rights granted to copyright owners by the Act, USGA's misappropriation claim under California law was not preempted. The trial court properly rejected Arroyo's defense of preemption.

## IV. SUMMARY JUDGMENT ON ARROYO'S CROSS-COMPLAINT

Arroyo's amended cross-complaint alleged three claims under California law: unfair competition, violation of the Cartwright Act, and tortious interference with prospective economic advantage. The trial court awarded USGA summary adjudication as to each of these claims. On appeal, Arroyo does not mention any of these causes of action. Instead, it argues that the trial court erred in awarding summary adjudication because there are assertedly disputed issues of material fact under *federal antitrust law* as codified in the Sherman Act. (15 U.S.C. § 1 et seq.)

Arroyo's present contention is patently frivolous. In the first place, its amended cross-complaint did not include any claim under the Sherman Act or federal antitrust law. Obviously, appellant cannot challenge a judgment on the basis of a new cause of action it did not advance below. (*Gibson Properties Co.* v. *City of Oakland* (1938) 12 Cal.2d 291, 299 [83 P.2d 942]; *City of San Diego* v. *Rider* (1996) 47 Cal.App.4th 1473, 1493 [55 Cal.Rptr.2d 422].) Moreover, even if Arroyo had made such a claim below, the trial court would not have had jurisdiction to consider it. Federal courts have exclusive jurisdiction over all Sherman Act claims, and state courts are

precluded from considering such claims. (15 U.S.C. § 15; *Blumenstock Bros. Advertising Agency* v. *Curtis Pub. Co.* (1920) 252 U.S. 436, 440 [40 S.Ct. 385, 386-387, 64 L.Ed. 649]; *R.E. Spriggs Co.* v. *Adolph Coors Co.* (1974) 37 Cal.App.3d 653, 659 & fn. 7 [112 Cal.Rptr. 585].)

The actual gravamen of Arroyo's cross-complaint below was that USGA's filing of this action constituted "sham litigation" pursued for an improper motive rather than to enforce intellectual property rights. The trial court properly rejected this claim. The trial court's determination that USGA had submitted substantial evidence in support of its common law misappropriation claim was by itself sufficient to demonstrate as a matter of law that USGA's lawsuit was not "objectively baseless" or "sham." (*Professional Real Estate Investors, Inc.* v. *Columbia Pictures Industries, Inc.* (1993) 508 U.S. 49, 56-65 [113 S.Ct. 1920, 1925-1930, 123 L.Ed.2d 611].) Because USGA has prevailed on *all* its misappropriation and service mark infringement claims filed since the *St. Andrews* decision, there is clearly no basis for concluding that any genuine issue of fact exists as to whether USGA has engaged in a pattern of filing baseless lawsuits. The trial court correctly concluded there was simply *no* admissible evidence in support of Arroyo's assertion that this was a sham lawsuit.

Arroyo asserts in this connection that the trial court erred in granting pro hac vice admission to two of USGA's attorneys nunc pro tunc. This contention is also meritless. USGA was represented at all times in this litigation by properly admitted California counsel. Indeed, Arroyo consented below to the granting of the pro hac vice motions with regard to USGA's two out-of-state attorneys. Its only objection was that the trial court made the order nunc pro tunc. The trial court had both jurisdiction and broad discretion to enter a nunc pro tunc order granting pro hac vice admission. (*Sampson* v. *Sapoznik* (1954) 124 Cal.App.2d 709, 711-712 [269 P.2d 209].) ▮ This discretion to grant a motion nunc pro tunc will not be reversed on appeal in the absence of plain abuse. (*Walter E. Heller Western, Inc.* v. *Superior Court* (1980) 111 Cal.App.3d 706, 711 [168 Cal.Rptr. 785]; *Sampson* v. *Sapoznik, supra,* 124 Cal.App.2d at p. 712.) Arroyo cannot possibly show any injury or prejudice to itself from the granting nunc pro tunc of the pro hac vice motions. The trial court's order did not preclude Arroyo from admitting any evidence it might have had in support of the contentions in its cross-complaint. (*Gomes* v. *Roney* (1979) 88 Cal.App.3d 274, 275 [151 Cal.Rptr. 756].) In short, this contention is completely meritless.

## V. Costs

Finally, USGA has cross-appealed on the issue of costs, contending the trial court committed reversible error by declining to make an award of costs

to it. Under Code of Civil Procedure section 1032, subdivision (b), "[e]xcept as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." (*Crib Retaining Walls, Inc.* v. *NBS/Lowry, Inc.* (1996) 47 Cal.App.4th 886, 889-891 [54 Cal.Rptr.2d 850].) A prevailing party is defined to include a defendant against whom any plaintiff failed to obtain any relief. (Code Civ. Proc., § 1032, subd. (a).) USGA insists that because Arroyo's cross-complaint was dismissed on USGA's motion for summary adjudication, USGA was the "prevailing party" on Arroyo's cross-complaint as a matter of statutory law, and the trial court erred in refusing to grant costs to USGA with respect to its successful defense of the amended cross-complaint.

Code of Civil Procedure section 1032, subdivision (a)(4), states that "[w]hen any party recovers other than monetary relief . . . , the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not . . . ." Because USGA did not recover monetary relief but was instead awarded a permanent injunction, the relief it obtained was purely equitable. The trial court correctly determined that it had discretion to award costs. In its discretion, the trial court expressly determined "in light of the circumstances of this case" that there was no prevailing party, and denied costs to either party in the exercise of its discretion. In view of the fact that USGA voluntarily dismissed all its claims against Arroyo for monetary damages on the eve of trial, the trial court did not abuse its discretion under Code of Civil Procedure section 1032, subdivision (a)(4) in denying costs to either party.

### DISPOSITION

The judgment is affirmed. Each party shall bear its own costs on appeal.

Hanlon, P. J., and Poché, J., concurred.

A petition for a rehearing was denied February 19, 1999, and the petition of appellant Arroyo Software Corporation for review by the Supreme Court was denied April 28, 1999.