[No. B231007. Second Dist., Div. Four. May 21, 2012.]

DIRECT SHOPPING NETWORK, LLC, Plaintiff and Respondent, v.
ROBERT JAMES, Defendant and Appellant.

### Counsel

Lewis Brisbois Bisgaard & Smith, Jeffry A. Miller, Matthew B. Stucky, Daniel C. DeCarlo, Daniel R. Lewis and Caroline Chan for Defendant and Appellant.

Yale & Baumgarten and David W. Baumgarten for Plaintiff and Respondent.

### Opinion

**MANELLA, J.**—For the second time we review an appeal from a trial court order denying a special motion to strike a complaint filed by respondent Direct Shopping Network, LLC (DSN). (See *Direct Shopping Network, LLC v. Interweave Press, LLC* (May 17, 2010, B216612) [nonpub. opn.] (*DSN I*).) DSN's December 2008 complaint asserted claims against Interweave Press, LLC, Colored Stone Magazine, Colored-Stone.com (collectively Interweave) and gemologist Robert James (appellant or James) for trade libel, interference with contract, and intentional and negligent interference with prospective economic advantage. All defendants were named in all counts. The complaint described DSN as a "designer, producer, marketer, and seller of fine jewelry products, including . . . products incorporating gemstones commonly referred to as 'andesine.' " The complaint alleged that defendants had published "false and defamatory" statements concerning andesine products marketed and sold by DSN. As set forth in our prior opinion, Interweave published a number of articles, either authored by James or relying on statements made by James, casting doubt on whether gem stones DSN had sold in 2008 as "Olympic andesine" were all natural and were mined in China. The complaint named both Interweave and James in all causes of action and did not distinguish between the conduct of the defendants.

Interweave filed a motion to strike, pursuant to Code of Civil Procedure section 425.16, the so-called "anti-SLAPP" statute. James filed his own motion to strike. DSN submitted the same evidence in opposition to both motions. Interweave's motion was heard first, and the trial court denied the motion, finding that while the claims arose from protected activity, DSN had demonstrated a probability of prevailing on the merits. DSN and James then stipulated to a denial of James's motion, but before the stipulation was

entered, Interweave filed an appeal of the trial court's order denying its motion. The trial court thereafter stayed all proceedings pending this court's resolution of the appeal.

We reversed the order denying Interweave's motion to strike, concluding that the statements were made in "a public forum in connection with an issue of public interest" within the meaning of the anti-SLAPP statute (Code Civ. Proc., § 425.16, subd. (e)(3)), and that DSN had failed to meet its burden of demonstrating a probability of prevailing on the merits. In particular, DSN failed to present admissible evidence that the Olympic andesine it sold was in fact all natural and came from China, and presented no evidence that it suffered damages and interference with business relationships of the type required to support its claims for trade libel and interference.

██ Following remand, and over James's objection, the trial court permitted DSN to present new evidence in support of its claims. Based on that new evidence, the trial court denied James's motion to strike. On appeal, James contends the doctrine of collateral estoppel barred DSN from relitigating the issue of its probability of prevailing on the merits. On the record before us, we agree and reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Publications*

The suit arose out of articles written and/or published by James and Interweave between March and September 2008 casting doubt on the authenticity of red-colored gem stones sold by DSN in connection with the Beijing Summer Olympics as "Olympic andesine."[1] (*DSN I, supra*, B216612.) The doubts arose because, until fairly recently, the only known sources of red gem-quality feldspar were mines in Oregon. (*Ibid.*) In the early 2000's, multiple dealers began to sell inexpensive red feldspar gem stones said to come from mines in and around China (Mongolia and Tibet) or the Congo. (*Ibid.*)

---

[1] As we explained in the prior opinion, DSN's lawsuit involved gem stones derived from a mineral with the scientific name "plagioclase feldspar," which is divided into subclassifications. The two subclassifications at issue here are andesine and labradorite, each of which can be used to make gem stones. Gem-quality feldspar comes in a number of colors, the most common of which is yellow. The color depends on the minerals present when the stones were formed. Yellow stones contain iron; red and green stones contain copper. (*DSN I, supra*, B216612.) Mines in Mexico and India produce yellow feldspar. The color of certain gem stones can be altered by "diffusion," "a process by which gem stones are heated to a very high temperature in an atmosphere that has a high level of one element or combination of elements, which allows that element to . . . enter the gemstone's crystal structure."

In an article dated April 17, 2008, James suggested that someone had "created[d] a look alike" that "emulate[ed] this 'rare labradorite from Oregon." In later articles, James suggested that the fact that the color on the exterior of certain inexpensive red feldspar stones did not appear to go all the way through indicated artificial color enhancement, and that the "most reasonable and justified conclusion" for inclusions observed on such stones was that they had been "diffusion treated." In his article dated July 22, 2008, discussed at length in our prior opinion, James stated that "most" dealers of the inexpensive red feldspar had "changed their original story that all of the material is totally natural and untreated." James claimed to have compared gem stone samples he had obtained "from every dealer source of 'andesine[-]labradorite' [he and his associates] could find," including DSN, using a "Raman microscope," and that the samples had "Raman scans" virtually identical to the Raman scans for Mexican yellow feldspar, indicating that the stones' origin was Mexico. He also claimed to see in some of the stones a green core surrounded by red, which could not have happened naturally. Finally, he claimed to have found a stone in which "the red diffusion material [could be seen] still stuck in [a weak spot or 'ribbon' inside the stone] that never made it into the interior of the gemstone," which he referred to as "the proverbial smoking gun" and "[p]roof positive that this 'andesine[-]labradorite' claimed to be untreated and from the Congo, is actually diffusion treated yellow feldspar from Mexico that stopped off in China or Thailand . . . ."

In the July 22 article, James mentioned Olympic andesine, specifically, stating that the specimens available to him evidenced the same "Raman footprint" as diffusion treated andesine and that "in all categories of gemological testing the two specimens of 2008 Olympic andesine that we have in our office both test out exactly as the other 100+ specimens of diffusion treated andesine in our lab." Later articles, published in July and September 2008, focused entirely on DSN's Olympic andesine. One stated that the "striped and banded coloration" in a red Olympic andesine stone James purportedly analyzed was the same as in stones he had determined were diffusion treated and had the same "Raman footprint." Another James article stated that four Olympic andesine stones in his possession contained "[l]amella ribbons that look[ed] just like every other formation of this type in every other bulk diffusion treated andesine that we have seen to date."

Interweave, publisher of Colored Stone Magazine and producer of the content of Colored-Stone.com, publications that covered the gem stone industry, republished James's July 22 report and also published articles of its own, essentially agreeing that the material was artificially treated and from Mexico. (See *DSN I, supra,* B216612.) As discussed in our prior opinion, the evidence presented established that Interweave published five articles dealing with red feldspar: one—the July 22 publication—was written by James; two

others quoted him extensively and discussed the results of his tests. (*Ibid.*) Two others contained no reference to James, but contained the same essential allegations concerning the coloration and provenance of the stones. (*Ibid.*)

### B. *The Complaint*

DSN's complaint named Interweave and James in all causes of action and did not differentiate between the parties. It alleged that "the defendants willfully maliciously and without justification or privilege, published and/or caused to be published to other persons in the gemstone community, including but not limited to DSN customers, in and outside of the County of Los Angeles, State of California, false and defamatory statements concerning andesine products marketed and sold by DSN." It did not specify the nature of the statements, the dates they were made, or which of the defendants made them. The complaint alleged generally that as a result of defendants' actions, DSN had suffered "lost profits and lost business opportunity, in an amount presently unknown" and had suffered damages "in an amount presently unknown." It did not specify any particular party or parties who had refused to do business with DSN as a result of the allegedly false and defamatory statements.

### C. *James's Motion to Strike*

Following the filing of Interweave's motion to strike, James, too, moved to strike under the anti-SLAPP statute. Like Interweave, he contended that his statements concerning DSN's gem stones were made in a public forum on an issue of public interest and that DSN could not demonstrate a probability of success on the merits, primarily because all his statements were nonactionable opinions. Because DSN had not specified the statements or publications on which its suit was based, James attached all the articles he had written involving red feldspar that were published prior to the complaint.

### D. *DSN's Opposition to James's Motion to Strike*

In opposition to James's motion to strike, DSN presented the identical evidence it had submitted in opposition to Interweave's motion. In addition, because the court had, in the interim, denied Interweave's motion to strike, DSN argued that James was collaterally estopped from litigating the issues in his motion because: "The issues resolved in the [Interweave] . . . motion are identical to the issues presented in this motion; and an order on an anti-SLAPP motion is directly appealable, and therefore a final order; and [Interweave] and James are in privity in that [Interweave] published James'[s] statements." Describing the issues, DSN stated: "The ultimate issue in the [Interweave] motion was whether [DSN] could meet its burden of demonstrating a probability of prevailing on its claims." "[Interweave] asserted that

[DSN] could not meet its burden of demonstrating a probability of prevailing on its claims because James'[s] statements that DSN's Olympic andesine is Mexican feldspar were non-actionable opinion and were not otherwise provably false. [Citation.] . . . The instant motion presents the exact same issues based on the exact same evidence." (Italics omitted.)

Essentially conceding the collateral estoppel issue, James entered into a stipulation with DSN, agreeing, inter alia, that James's anti-SLAPP motion would be deemed denied for the reasons set forth in the trial court order denying Interweave's motion, and that James reserved the right to appeal the denial. However, the court did not enter an order on the stipulation, apparently believing Interweave's appeal stayed further action in the litigation.[2]

### E. *Prior Appeal*

■ As explained in our prior opinion, defendants' statements about the authenticity of gem stones sold to the public fell under anti-SLAPP protection because they " 'involved a topic of widespread public interest' " that touched " 'a large number of persons.' " (*DSN I, supra,* B216612, quoting *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 899 [17 Cal.Rptr.3d 497].) Because the necessary threshold had been met, showing that the challenged claims arose from protected activity, the burden shifted to DSN to demonstrate a probability of prevailing on its claims. (See *Nygård v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1035 [72 Cal.Rptr.3d 210]; *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1010 [113 Cal.Rptr.2d 625].) "[I]n order to establish the requisite probability of prevailing [citation], . . . '. . . the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' " (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88–89 [124 Cal.Rptr.2d 530, 52 P.3d 703].)[3]

As pointed out in our prior opinion, DSN failed to demonstrate a probability of prevailing. It attempted, but failed, to raise a triable issue of fact concerning the Chinese origin of the stones or whether they had been color

---

[2] An appeal of an order granting or denying an anti-SLAPP motion stays all further proceedings on the merits of the affected causes of action. (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 190–192 [25 Cal.Rptr.3d 298, 106 P.3d 958].) It does not deprive the court of jurisdiction to consider unaffected claims.

[3] As we further explained, the standard applied by the trial court in determining whether the requisite showing had been made by the plaintiff "is 'similar to the standard used in determining motions for nonsuit, directed verdict, or summary judgment,' in that the court cannot weigh the evidence." (*ComputerXpress, Inc. v. Jackson, supra,* 93 Cal.App.4th at p. 1010.) The sufficiency of the showing is reviewed independently on appeal. (*Hailstone v. Martinez* (2008) 169 Cal.App.4th 728, 736 [87 Cal.Rptr.3d 347].)

treated.[4] Moreover, DSN failed to present any admissible evidence that it had suffered the requisite damages; it identified no particular transactions of which DSN was deprived and identified no specific customers or relationships that were interfered with, as required to support its claims for trade libel and interference with prospective economic advantage.[5]

### F. Subsequent Proceedings

After remand, and over James's objection, the trial court granted DSN permission to file a supplemental opposition to James's motion to strike. DSN submitted new evidence concerning the stones' origin and whether they had been color treated, as well as DSN's damages.[6]

---

[4] DSN submitted the declaration of Arthur Garabedian, its president and managing member, who sought to establish that the Olympic andesine was natural and from China. However, his declaration contained hearsay reports from third parties concerning testing allegedly performed by the company which sold the stones to DSN and the existence of red andesine mines in China. With respect to DSN's damages, Garabedian's declaration stated: "DSN has lost substantial sales as a result of the defendants' false assertions that our Olympic red andesine products are not from China, but instead are Mexican feldspar." There was no other evidence presented to support damages.

DSN included a declaration from George R. Rossman, Ph.D., a professor of mineralogy at Caltech (California Institute of Technology). Dr. Rossman stated that he had analyzed "DSN gemstones bearing the Olympic mark" and "compared the properties of those stones against yellow feldspar from Mexico." He concluded that "the DSN stone[s] bearing the Olympic mark are not Mexican feldspar." He expressed no opinion concerning the actual origin of the stones.

[5] In supplemental briefing, DSN disputed that it was required to present evidence of damages, contending that element of its claims had not been challenged by Interweave's motion to strike. We pointed out that once a defendant has established that a cause of action arose from protected activity, the burden is on the plaintiff to " 'state[] and substantiate[] a legally sufficient claim' " with admissible evidence supporting " 'a judgment in the plaintiff's favor.' " (DSN I, supra, B216612, quoting Mann v. Quality Old Time Service, Inc. (2004) 120 Cal.App.4th 90, 105 [15 Cal.Rptr.3d 215]; see College Hospital Inc. v. Superior Court (1994) 8 Cal.4th 704, 719 [34 Cal.Rptr.2d 898, 882 P.2d 894] [Code Civ. Proc., § 425.16 and similar statutes "operate[] like a demurrer or motion for summary judgment in 'reverse . . .'[:] [r]ather than requiring the defendant to defeat the plaintiff's pleading by showing it is legally or factually meritless, the motion requires the plaintiff to demonstrate that he possesses a legally sufficient claim which is 'substantiated,' that is, supported by competent, admissible evidence"].)

[6] The new evidence included (1) a declaration from a representative of the company that had sold DSN the andesine, stating that a sampling of the stones had been tested; (2) a declaration from a person who claimed to have visited a Tibetan red andesine mine and obtained samples; (3) testimony from Dr. Rossman in which he discussed testing samples of red feldspar and his unsuccessful attempts to infuse yellow feldspar with copper and obtain a gem-quality stone; (4) a declaration from Phillip B. Gans, a Ph.D. in structural geology, stating that he tested the same Olympic andesine stones James had subjected to Raman scans and concluded none of them had been subjected to the high temperatures needed to infuse copper and artificially color the stone; (5) declarations from two customers stating that they returned for refunds Olympic andesine purchased from DSN after reading statements by James; and (6) a supplemental

James objected to the court's consideration of the supplemental opposition and filed a reply contending that principles of collateral estoppel required the court to grant the anti-SLAPP motion.

The trial court overruled James's objections to the supplemental opposition and denied his anti-SLAPP motion. The court found that DSN had produced admissible evidence, which if credited by the trier of fact, would support a prima facie showing of falsity, disparagement and damages, "including evidence that identified consumers returned the product upon reading the statements." James appealed.

## DISCUSSION

■ "Collateral estoppel bars a party to an action, or one in privity, from subsequently relitigating issues actually litigated and finally decided against it in the earlier action. [Citations.] A corollary of the rule that collateral estoppel is confined to issues 'actually litigated' is the requirement that the issue decided previously be 'identical' with the one sought to be precluded. [Citations.] Thus, a nonparty may invoke collateral estoppel against a party to a prior action only if three conditions are met: (1) the issue necessarily decided in the prior action is identical to the issue sought to be relitigated in the current action; (2) there was a final judgment on the merits in the previous action; and (3) the party against whom collateral estoppel is asserted was a party, or in privity with a party, to the previous suit. [Citations.]" (*United States Golf Assn. v. Arroyo Software Corp.* (1999) 69 Cal.App.4th 607, 615–616 [81 Cal.Rptr.2d 708], italics omitted.)

" 'If the matter was within the scope of the action, related to the subject-matter and relevant to the issues, so that it *could* have been raised, the judgment is conclusive on it despite the fact that it was not in fact expressly pleaded or otherwise urged.' " (*Warga v. Cooper* (1996) 44 Cal.App.4th 371, 377–378 [51 Cal.Rptr.2d 684], quoting *Sutphin v. Speik* (1940) 15 Cal.2d 195, 202 [99 P.2d 652].) A party cannot " 'by negligence or design withhold issues and litigate them in consecutive actions' " (*Warga v. Cooper, supra,* at p. 378), or "escape the bar of the prior decision[] by asserting that . . . [it has] other evidence which was not introduced in the earlier proceedings." (*MIB, Inc. v. Superior Court* (1980) 106 Cal.App.3d 228, 235 [164 Cal.Rptr. 828].)

There is no dispute that there was a final judgment on the merits in DSN's action against Interweave or that DSN was a party to that judgment. The sole dispute raised concerns identity of the issues. We conclude that in view of the

---

Garabedian declaration stating that DSN sold over $280,000 of Olympic andesine in June and July 2008, prior to James's July 22 " 'Andesine Report,' " but sold only $9,682 and $6,531 of Olympic andesine in August and September 2008, respectively.

allegations of the complaint and the evidence presented for consideration in connection with both motions to strike, the issues were the same.

That the allegedly defamatory statements of both defendants were substantially the same in content cannot be seriously disputed. James wrote articles in which he claimed to have conducted analyses of multiple inexpensive red andesine or andesine-labradorite stones and, through a process that included both enhanced observation and scientific testing, established that the color was not natural and that the stones came from Mexican mines. Interweave's stories were either word-for-word republications of James's article (the July 22 "Andesine Report") or articles containing the same allegations—and the latter were generally backed up by quotes from James or references to his work. DSN's complaint, which framed the issues for the subsequent motions to strike, did not distinguish between the two defendants or their publications. It treated Interweave and James as one and the same, alleging that *"the defendants* willfully maliciously and without justification or privilege, published and/or caused to be published to other persons in the gemstone community . . . false and defamatory statements concerning andesine products marketed and sold by DSN." (Italics added.)

Given the indistinguishable nature of James's and Interweave's statements concerning andesine and the manner in which the complaint's allegations were pled, it is not surprising that the issues raised in their separate motions to strike were identical: both contended that their statements concerning DSN's andesine gem stones were made in a public forum on an issue of public interest and that DSN could not demonstrate a probability of success on the merits of its claims. DSN's opposition to Interweave's motion and its initial opposition to James's motion presented the same evidence. James and DSN recognized the issues were the same when they stipulated that James's motion would be deemed denied for the reasons set forth in the order denying Interweave's motion. Had the trial court entered an order on the stipulation, James's appeal would have been pending at the same time as Interweave's and, based on the identity of issues and evidence, would have been resolved in the same manner.

Notwithstanding its assertion in the court below that the issues resolved in the Interweave motion were identical to the issues presented in James's motion, DSN now contends on appeal that there is no identity of issues because "James published three defamatory articles regarding origin and treatment of the Gemstones independent of Interweave." The fact that James published additional articles is, in our view, irrelevant. The issue is not whether DSN could have sued James separately for various allegedly libelous statements, but whether the causes of action it did file against Interweave and James encompassed the substance of the statements litigated in Interweave's

motion. Clearly they did, and DSN's opposition to James's motion identified no additional statements of James's that differed materially in substance from those challenged in DSN's opposition to Interweave's motion.

As an additional basis for claiming the issues were not identical, DSN asserts that the prior appeal "involved the issue of the origin of the Gemstones, not color treatment . . . ." The record demonstrates otherwise. All of the allegedly libelous statements challenged the authenticity of the stones' coloration, and DSN offered the same evidence on the issue of naturalness in opposition to both Interweave's and James's motions. That evidence was properly excluded as hearsay. Having had a full and fair opportunity to present evidence challenging James's and Interweave's assertions that the stones were color treated, DSN was not entitled to supplement its inadequate showing by bringing in "other evidence . . . not introduced in the earlier proceedings." (*MIB, Inc. v. Superior Court, supra*, 106 Cal.App.3d at p. 235 [applying collateral estoppel to bar relitigation of existence of personal jurisdiction over nonresident defendant].)

DSN next contends that collateral estoppel should not be applied because new facts came to light that were unavailable at the time the prior motion was litigated. Specifically, after the Interweave motion was resolved, DSN obtained through discovery in a class action the Olympic andesine stones analyzed and tested by James and submitted them to testing by Dr. Gans, who concluded that the stones had never been heated to the temperature required for infusion of copper. DSN contends this new evidence renders collateral estoppel inapplicable. We disagree. Although DSN did not have the particular stones tested by James, it had its entire stock of unsold Olympic andesine available and could have tested representative samples of those stones to make the same point. Moreover, DSN has not asserted that evidence of damages was unavailable to it at the time it opposed Interweave's motion to strike. Thus, even if its failure of proof regarding the stones had been beyond its control, DSN's failure to present evidence of damages was not; that latter failure proved fatal to its claims.

■ Our conclusion that new evidence, however compelling, is generally insufficient to avoid application of collateral estoppel is supported by the decision in *Evans v. Celotex Corp.* (1987) 194 Cal.App.3d 741 [238 Cal.Rptr. 259] (*Evans*). There, the family of a deceased man sought to pursue a claim against a defendant who had successfully defended a suit brought by the decedent during his lifetime. The family argued that "new facts" had occurred since the judgment on the prior claim, including information from an autopsy. (*Id.* at p. 747.) The court concluded that because the additional evidence "did not establish a previously undiscovered theory of liability" nor "denote a change in the parties' legal rights," it could not be used as justification to

permit the family to relitigate issues of liability. (*Id.* at p. 748.) "An exception to collateral estoppel cannot be grounded on the alleged discovery of more persuasive evidence. Otherwise, there would be no end to litigation." (*Ibid.*)

DSN's case is even less compelling than that of the plaintiffs in *Evans*, who could credibly claim to have been unable to acquire postmortem evidence prior to the decedent's death. Here, nothing prevented DSN from testing stones marketed as Olympic andesine and nothing prevented it from presenting evidence of its alleged damages. Like the plaintiffs in *Evans*, however, on remand DSN sought to present more persuasive evidence than it had marshaled when it first opposed the motions to strike. It is precisely this "second bite at the apple" that collateral estoppel is designed to bar.

■ Finally, DSN contends that application of collateral estoppel in the present circumstances would be inequitable. There is an equitable component to collateral estoppel. "[E]ven where the technical requirements are all met, the doctrine is to be applied 'only where such application comports with fairness and sound public policy.' " (*Smith v. ExxonMobil Oil Corp.* (2007) 153 Cal.App.4th 1407, 1414 [64 Cal.Rptr.3d 69], italics omitted, quoting *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 835 [88 Cal.Rptr.2d 366, 982 P.2d 229].) In *Smith v. ExxonMobil Corp.*, a judgment was rendered against the defendant after a defense expert was unable to testify due to the death of his daughter while trial was in progress. The plaintiffs in a new lawsuit sought to use collateral estoppel offensively to preclude the defendant from raising defenses to liability which the expert's testimony would have supported. "In the unusual and compelling circumstances" of the case in which the prior trial did not provide "a full and fair opportunity to present a defense," the court concluded that application of collateral estoppel would be "unfair." (*Smith v. ExxonMobil Corp., supra*, at p. 1420.)

We find no such unusual or compelling circumstances here. DSN, a "designer, producer, marketer, and seller of fine jewelry," filed a complaint setting forth identical claims against parties who were making similar assertions about gem stones DSN sold in connection with the Beijing Olympics as all natural and originating in China. The defendants filed separate, but essentially parallel, motions to strike and DSN filed identical oppositions. Interweave's motion was denied by the trial court and appealed. James's motion was resolved by stipulation of the parties and would have been appealed had the trial court not stayed the proceedings. Our prior opinion determined that DSN had failed to demonstrate a probability of prevailing on its claims. This ruling was final and case dispositive.

The purpose of collateral estoppel is to prevent a party from repeatedly litigating an issue in order to secure a different result. DSN had a full and fair

opportunity to litigate the relevant issues when it opposed Interweave's motion and again when it opposed James's. It was not entitled to use our opinion as a roadmap for curing the evidentiary deficiencies in its showing. In short, we find no inequity in applying collateral estoppel to bring this litigation to a close.[7]

## DISPOSITION

The judgment is reversed. Appellant is awarded costs on appeal.

Epstein, P. J., and Willhite, J., concurred.

---

[7] To the extent DSN suggests it would be unfair to apply collateral estoppel in the absence of a direct challenge to the adequacy of its damages showing, see footnote 5, *ante.*