[No. D051669. Fourth Dist., Div. One. June 9, 2009.]

PATRICIA HUBER et al., Plaintiffs and Respondents, v.
RONALD W. JACKSON et al., Defendants and Appellants;
THE EPISCOPAL CHURCH, Intervener and Respondent.

Counsel

Payne & Fears, Eric C. Sohlgren and Daniel F. Lula for Defendants and Appellants.

Holme Roberts & Owen, John R. Shiner, Brent E. Rychener; Horvitz & Levy and Jeremy B. Rosen for Plaintiffs and Respondents.

Goodwin Procter, David Booth Beers, Heather H. Anderson, Jeffrey D. Skinner and Elizabeth F. Stone for Intervener and Respondent.

Opinion

McCONNELL, P. J.—The principal issue in this appeal is whether a local parish or the general church and its diocese own property held in the parish's name, after the parish vestry and a majority of the congregants voted to disaffiliate the parish from the general church and affiliate with another church. After the parties completed their briefing, the California Supreme Court resolved the church property issue against a local parish in a case with facts substantively the same as those here. We are, of course, bound by that precedent. (*Episcopal Church Cases* (2009) 45 Cal.4th 467 [87 Cal.Rptr.3d 275, 198 P.3d 66].) Further, under our opinion in *New v. Kroeger* (2008) 167 Cal.App.4th 800 [84 Cal.Rptr.3d 464] (*Kroeger*), we reject the assertion the trial court erred by finding that by voting for disaffiliation, defendants lost the authority to direct the parish corporation, and thus their purported amendments to the parish's governing documents were ultra vires. As there are no material facts requiring trial, we affirm summary judgments for the general church and its diocese.

FACTUAL AND PROCEDURAL BACKGROUND

The Episcopal Church, also known as the Protestant Episcopal Church (hereafter Episcopal Church), a nonprofit unincorporated association, was organized in the United States in 1789. It is a hierarchical church comprised of 111 dioceses. Collectively, the dioceses have thousands of individual churches, called parishes and missions (which do not meet all qualifications to be parishes), where congregants worship. Dioceses are governed by bishops and an annual convention, and parishes are governed by a vestry, consisting of a rector, who is an ordained priest, and a group of elected

laypersons. At the national level, the Episcopal Church is governed by a general convention composed of bishops and deputies, the latter of which include members of parish vestries. The Episcopal Church's constitution and other rules called "canons" are binding on all Episcopal dioceses and parishes, and the dioceses' constitutions and canons are binding on all parishes.

The Episcopal Church entrusts the establishment of parishes to the dioceses. In 1931, St. Luke's of the Mountains Parish of La Crescenta (St. Luke's Parish), then an unincorporated Episcopal mission, sought permission from the Episcopal Diocese of Los Angeles to become a parish. In its application, as required by a canon of the Los Angeles diocese, the representatives of the proposed parish submitted this oath: "[W]e hereby solemnly promise and declare that the said Parish shall be forever held under the ecclesiastical authority of the Bishop of Los Angeles, and of his successors in office; and in conformity with the Constitution and Canons of the Church now known as the Protestant Episcopal Church in the U.S. of A., and the Constitutions and Canons of the Diocese of Los Angeles, the authority of which we do hereby recognise [sic], and bind ourselves to make part of the Constitution of said Parish, to whose liturgy, doctrine, discipline rights and usages, we do promise at all times, for ourselves and our successors, corporate obedience and conformity."

On or about January 28, 1931, St. Luke's Parish was admitted as a parish of the Los Angeles diocese. In July 1940 St. Luke's Parish filed its original articles of incorporation with the Secretary of State, entitled "Articles of Incorporation of the Rector, Wardens, and Vestrymen of St. Luke's of the Mountains Episcopal Church in La Crescenta, Incorporated." The articles stated "the purposes for which the said corporation is formed are: (a) To establish and maintain a parish which shall form a constituent part of the Diocese of Los Angeles . . . , (b) To hold all property of the Association owned prior to incorporation, and such as may be acquired hereafter in any manner; to transact all business relating thereto, to encumber or alienate property under such conditions and restrictions as may be prescribed by law and by the Constitutions and Canons of the said Church." The articles also stated: "The Constitution and Canons, rules, regulations and discipline of the said branch of The . . . Episcopal Church . . . , and the Constitutions and Canons of the said Church in the Diocese of Los Angeles, for the time being, shall, unless they be contrary to the laws of this State, always form a part of the By-Laws, Ordinances, Constitution and Articles of Incorporation of this corporation."

In 1924, Louisa S. Janvier had deeded real property to the bishop of the Los Angeles diocese. The deed stated: "Provided always and this grant is made upon the express condition that said Lot shall be used for church purposes only according to the canons, usages, and doctrines of the Protestant Episcopal Church, and that a church or chapel shall be erected on said property within ten years." A church was constructed on the property, and in August 1940 the bishop of the Los Angeles diocese deeded the property to St. Luke's Parish for a consideration of $10. The parish purchased two other parcels in the 1950's with parish funds.

A number of canons of the Episcopal Church pertain to parish property and have historically prohibited a parish from alienating property without obtaining permission from the higher authorities. For instance, canon II.6 provides: " 'Sec. 1. No Church or Chapel shall be consecrated until the Bishop shall have been sufficiently satisfied that the building and the ground on which it is erected are secured for ownership and use by a Parish, Mission, Congregation, or Institution affiliated with this Church and subject to its Constitution and Canons. [¶] Sec. 2. It shall not be lawful for any Vestry, Trustees, or other body authorized by laws of any State or Territory to hold property for any Diocese, Parish or Congregation, to encumber or alienate any dedicated and consecrated Church or Chapel, or any Church or Chapel which has been used solely for Divine Service, belonging to the Parish or Congregation which they represent, without the previous consent of the Bishop, acting with the advice and consent of the Standing Committee of the Diocese.' " (*Episcopal Church Cases, supra*, 45 Cal.4th at pp. 474–475.) The Episcopal Church adopted the original version of section 2 of canon II.6 in 1868, and it added section 1 in 1871. (45 Cal.4th at p. 475.)[1]

Further, at its 1979 annual meeting the Episcopal Church adopted canon I.7.4, which expressly confirms that on a parish's disaffiliation from the church, parish property belongs to the Episcopal Church or the diocese. Canon I.7.4 provides: "All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission or Congregation otherwise existing over such property so long as the particular Parish, Mission or Congregation remains a part of, and subject to, this Church and its Constitution and

---

[1] Additionally, the parish's corporate bylaws stated: "The Rector, *subject to the Bishop of the Diocese*, shall have exclusive charge of all things pertaining to or affecting the spiritual interests of the Parish. . . . He shall at all times have access to the church building or church buildings, and shall have the custody of the keys of the same." (Italics added.) The bylaws also prohibited the vestry from selling, conveying or encumbering the property without complying with diocesan canon 3.06, which prohibited a parish from selling, conveying or encumbering parish property without its written permission.

Canons." St. Luke's Parish was officially represented at the 1979 annual meeting by its rector and lay delegates.

Before the instant dispute arose, St. Luke's Parish had last amended its bylaws in 1993. The bylaws acknowledged that the "corporation [or parish] is an *integral subordinate unit and constituent part of the [P]rotestant Episcopal Church in the Diocese of Los Angeles and of the Protestant Episcopal Church in the United States of America. The Constitution and Canons of [those entities], now or hereafter in effect, are incorporated, by reference, in these Bylaws, as a basic and essential part hereof.*" (Italics added.)

In 2003 the Episcopal Church ordained an openly gay man as a bishop in New Hampshire. (*Episcopal Church Cases, supra,* 45 Cal.4th at p. 475.) In November 2003 the vestry of St. Luke's Parish purported to revise the corporation's bylaws to eliminate references to the Episcopal Church. The vestry, however, did not then notify the congregation. In February 2006 the vestry and a wide majority of the congregants of St. Luke's Parish voted to disaffiliate from the Episcopal Church and join the Anglican Church of Uganda (Anglican Church). Shortly thereafter, the vestry caused to be recorded amended articles of incorporation that purported to rename the corporation "St. Luke's of the Mountains Anglican Church in La Crescenta."

The bishop of the Los Angeles diocese quickly advised St. Luke's Parish's vestry members they were no longer entitled to control parish property or act on behalf of St. Luke's Episcopal Parish. Further, under an Episcopal Church canon, the bishop appointed a priest-in-charge of the parish "to manage the affairs of the parish and to minister to the parish's remaining faithful Episcopalian members until a new vestry and rector can be properly elected." The dissident faction, however, refused to surrender the property and continued to use it in their association with the Anglican Church. The congregants who remained loyal to the Episcopal Church "were no longer allowed to use their own parish as Episcopalians."

In April 2006 the Los Angeles diocese, its bishop, the priest-in-charge of the parish, and a parish member who remained faithful to the Episcopal Church, sued the former rector and other former vestry members of St. Luke's Parish (defendants), for declaratory and injunctive relief and breach of contract. The complaint also named the parish corporation as a "nominal [d]efendant because it is currently under the *de facto* control of individuals who claim authority to divert the Property of the Parish for their own use." A first amended complaint alleged the parish property was held in

trust for the Episcopal Church and the Los Angeles diocese, that after defendants' disaffiliation they and their new parish have no right in the property, and their purported changes to the corporate structure were ultra vires. The Episcopal Church filed a complaint in intervention.

All parties moved for summary judgment, agreeing the material facts are undisputed. The court granted the Episcopal Church's and the Los Angeles diocese's motions and denied defendants' motion. The judgment provides that "[a]ll real and personal property held by or for the benefit of St. Luke's [Parish] on or before February 13, 2006, . . . is held in trust for the Episcopal Church and the [Los Angeles] Diocese"; "Defendants may not retain possession, ownership, or control of the Property"; "Defendants' actions in attempting to disaffiliate St. Luke's Episcopal Parish from the Episcopal Church and the Diocese were *ultra vires*"; the "Episcopal Church hierarchy has resolved the intra-congregational dispute between Plaintiffs and Defendants by determining a) which congregants are the actual members of St. Luke's, b) the authorized parish leadership to be the duly appointed Priest-in-Charge and the Episcopal vestry at such time as it may be reconstituted, and c) that the authorized parish leadership has the right to use, manage and control the Property in accordance with the Episcopal Church and Diocesan Constitutions and Canons"; "Defendants may not divert, alienate or use the Property for any purposes whatsoever"; and "St. Luke's Episcopal Parish shall be exclusively comprised of those individuals recognized by the Diocese and the Episcopal Church."

## DISCUSSION

### I

### *Standard of Review*

A "party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he [or she] is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) A defendant satisfies this burden by showing " 'one or more elements of' the 'cause of action' . . . 'cannot be established,' or that 'there is a complete defense' " to that cause of action. (*Ibid.*) We review the trial court's ruling on summary judgment de novo. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].)

## II

### A

*Supreme Court Precedent:* Episcopal Church Cases *Opinion*

Defendants contend the trial court erred by not deciding the church property dispute under the four-factor "neutral principles of law" approach, and instead deferring to the position of the Episcopal Church and the Los Angeles diocese under an appellate opinion that applied a "principle of government" approach to such a dispute, but is no longer good law because the California Supreme Court accepted review of the case. Defendants assert the rule of deference applies only when a dispute cannot be resolved without deciding a religious issue, and this is not such a case. Defendants submit that under a neutral principles of law approach, they should prevail, particularly since the parish holds record title to the property rather than the higher church authorities.

■ The Supreme Court has now decided the case to which defendants refer, *Episcopal Church Cases*, but not in a manner helpful to them. To the contrary, the opinion resolves the property dispute here in favor of the Episcopal Church and the diocese. The court held that a neutral principles of law approach applies to a church property dispute when it can be decided without reference to religious principles, but under such an approach a local parish held property in trust for the national church under facts substantively the same as those here. (*Episcopal Church Cases, supra,* 45 Cal.4th at pp. 478–482.)

■ The First Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment (*Cantwell v. Connecticut* (1940) 310 U.S. 296, 303 [84 L.Ed. 1213, 60 S.Ct. 900]), provides: "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof . . . ." "Because of the risks of inhibiting the free development of religion and entangling secular interests in ecclesiastical concerns, the 'First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes.' " (*Episcopal Church Cases, supra,* 45 Cal.4th at p. 494 (conc. & dis. opn. of Kennard, J.).)

■ As the United States Supreme Court explained in *Jones v. Wolf* (1979) 443 U.S. 595, 602 [61 L.Ed.2d 775, 99 S.Ct. 3020], a state "has an obvious and legitimate interest in the peaceful resolution of property disputes, and in

providing a civil forum where the ownership of church property can be determined conclusively." However, the "First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice. [Citations.] As a corollary to this commandment, the Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization." (*Ibid.*) "Subject to these limitations, however, the First Amendment does not dictate that a State must follow a particular method of resolving church property disputes. Indeed, 'a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.' " (*Ibid.*)

In *Jones v. Wolf, supra,* 443 U.S. at pages 602 and 603, the court held a state could constitutionally adopt a " 'neutral principles of law' " approach to resolving church property disputes. This approach considers the language of the deeds, the terms of the local church's charter, the provisions of the general church's governing documents pertaining to property ownership, and any relevant state statutes governing the holding of church property. (*Id.* at p. 603.) "The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." (*Ibid.*)

The majority in *Jones v. Wolf* rejected the dissent's argument that the First Amendment compels use of the "principle-of-government approach" for hierarchical churches approved in *Watson v. Jones* (1871) 80 U.S. 679 [20 L.Ed. 666], under which the "higher church authorities would necessarily win." (*Episcopal Church Cases, supra,* 45 Cal.4th at p. 486.) The majority in *Jones v. Wolf* wrote that the dissent's argument "assumes that the neutral-principles method would somehow frustrate the free-exercise rights of the members of a religious association. Nothing could be further from the truth. The neutral-principles approach cannot be said to 'inhibit' the free exercise of religion, any more than do other neutral provisions of state law governing the manner in which churches own property, hire employees, or purchase goods. Under the neutral-principles approach, the outcome of a church property dispute is not foreordained. *At any time before the dispute erupts,* the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. *Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church.* The burden involved in taking such steps will be minimal. *And the civil courts will be bound to give*

*effect to the result indicated by the parties*, provided it is embodied in some legally cognizable form." (*Jones v. Wolf, supra*, 443 U.S. at p. 606, italics added.)

*Episcopal Church Cases, supra*, 45 Cal.4th 467, involved the St. James Parish in Newport Beach (St. James Parish), a former parish of the Los Angeles diocese, which also disaffiliated itself from the Episcopal Church after it ordained a gay bishop. A disagreement arose as to parish property. The Los Angeles diocese and various individuals sued persons affiliated with St. James Parish, and the Episcopal Church intervened. (*Id.* at p. 476.)

After discussing *Jones v. Wolf* at length, the court in *Episcopal Church Cases* held: "[S]ecular courts called on to resolve church property disputes should proceed as follows: State courts must not decide questions of religious doctrine; those are for the church to resolve. Accordingly, if resolution of a property dispute involves a point of doctrine, the court must defer to the position of the highest ecclesiastical authority that has decided the point. But to the extent the court can resolve a property dispute without reference to church doctrine, it should apply neutral principles of law. The court should consider sources such as the deeds to the property in dispute, the local church's articles of incorporation, the general church's constitution, cannons, and rules, and relevant statutes, including statutes specifically concerning religious property, such as Corporations Code section 9142."[2] (*Episcopal Church Cases, supra*, 45 Cal.4th at p. 485.)

On the merits, the court found in favor of the Episcopal Church. The court noted that shortly after the *Jones v. Wolf* decision, "and in apparent reaction to it, the Episcopal Church added Canon I.7.4, which recites an express trust in favor of the denominational church. This occurred some 25 years before the instant dispute erupted." (*Episcopal Church Cases, supra*, 45 Cal.4th at p. 487.) Canon I.7.4 "states that the trust does not limit the authority of the parish over the property 'so long as the particular Parish . . . remains a part of, and subject to, this Church and its Constitution and Canons.' Other canons adopted long before St. James Parish existed also contained substantial restrictions on the local use of church property." (*Episcopal Church Cases, supra*, at p. 486.) The court concluded that *Jones v. Wolf*, "together with the Episcopal Church's adoption of Canon I.7.4 in response, strongly supports the conclusion that, once defendants left the general church, the property reverted to the general church." (*Episcopal Church Cases, supra*, at p. 487.)

Additionally, the court explained that section 9142, subdivisions (c) and (d), enacted in 1982 shortly after *Jones v. Wolf* was published, compels the

---

[2] Further statutory references are to the Corporations Code.

conclusion that once defendants voted to disaffiliate, the parish property reverted to the Episcopal Church. (*Episcopal Church Cases, supra*, 45 Cal.4th at p. 488.) As relevant, the statute provides: "(c) No assets of a religious corporation are or shall be deemed to be impressed with any trust, express or implied, statutory or at common law unless one of the following applies: [¶] . . . [¶] (2) Unless, and only to the extent that, the articles or bylaws of the corporation, *or the governing instruments of a superior religious body or general church of which the corporation is a member, so expressly provide.* [¶] . . . [¶] (d) Trusts created by paragraph (2) of subdivision (c) may be amended or dissolved by amendment from time to time to the articles, bylaws, or governing instruments *creating the trusts.* . . ." (§ 9142, italics added.)

 The court elaborated that the statute appears to be the type of statute the United States Supreme Court envisioned in *Md. & Va. Churches v. Sharpsburg Ch.* (1970) 396 U.S. 367 [24 L.Ed.2d 582, 90 S.Ct. 499] (*Church of God*), in approving a court's reliance on " 'provisions of state statutory law governing the holding of property by religious corporations . . . .' " (*Episcopal Church Cases, supra*, 45 Cal.4th at p. 481.) In *Church of God*, Justice Brennan added in his concurring opinion that a possible approach to resolving church property disputes " 'is the passage of special statutes governing church property arrangements in a manner that precludes state interference in doctrine. Such statutes must be carefully drawn to leave control of ecclesiastical polity, as well as doctrine, to church governing bodies.' " (*Episcopal Church Cases, supra*, at p. 488, quoting *Church of God, supra*, at p. 370 (conc. opn. of Brennan, J.).) In *Episcopal Church Cases, supra*, at pages 488–489, the court explained, "[s]ection 9142, subdivisions (c) and (d), does not permit state interference in religious doctrine and leaves control of ecclesiastical policy and doctrine to the church. Subdivision (c) of that section permits the governing instruments of the general church to create an express trust in church property, which Canon I.7.4 does. Subdivision (d) permits changing a trust, but only if done in the instrument that *created* it. Canon I.7.4 has not been amended."[3]

---

[3] Notably, in *Rector, Wardens and Vestrymen of Trinity-Saint Michael's Parish, Inc. v. Episcopal Church* (2003) 224 Conn. 797, 821–822 [620 A.2d 1280, 1292–1293], the court held that canon I.7.4 "merely codified in explicit terms a trust relationship that has been implicit in the relationship between local parishes and dioceses since the founding of [the Episcopal Church] in 1789. [Citation.] As was made clear at trial, the panoply of constitutional and canonical provisions of [the Episcopal Church] and the Diocese 'strongly indicate that the local church property was to be held for the benefit of the general church, and . . . show the extensive nature of the policy direction and property control to be exercised by the general church.' " (Fn. omitted; accord, *In re Church of St. James the Less* (2005) 585 Pa. 428 [888 A.2d 795, 810]; *Bishop and Diocese of Colorado v. Mote* (Colo. 1986) 716 P.2d 85, 108; *Trustees of Diocese of Albany v. Trinity Episcopal Church of Gloversville* (N.Y.App.Div. 1999) 250 A.D.2d 282, 288 [684 N.Y.S.2d 76].)

In *Episcopal Church Cases*, the court noted that although St. James Parish held record title to the property, the parish "agreed from the beginning of its existence to be part of a greater denominational church and to be bound by that greater church's governing instruments," and held, "[t]hose instruments make clear that a local parish owns local church property in trust for the greater church and may use that property only so long as the local church remains part of the greater church. Respect for the First Amendment free exercise rights of persons to enter into a religious association of their choice, as delineated in *Jones v. Wolf, supra*, 443 U.S. 595 (as well as the provisions of section 9142), requires civil courts to give effect to the provisions and agreements of that religious association." (*Episcopal Church Cases, supra*, 45 Cal.4th at p. 489.)

Here, neither the Episcopal Church nor the Los Angeles diocese held record title to the property at issue. As did the parish in *Episcopal Church Cases*, however, St. Luke's Parish agreed from the time it became a parish to be an integral part of the Episcopal Church and the Los Angeles diocese and to be bound by their governing documents. St. Luke's Parish was admitted as a parish after submitting an oath of obedience, and its articles of incorporation and bylaws promised allegiance to the national church and the diocese. Further, the bylaws do not allow amendment of the allegiance provision without permission from the higher authorities.

Contrary to defendants' position now, their agreement to be bound by the governing documents of the Episcopal Church extends to canon I.7.4. As the court concluded in *Episcopal Church Cases*, "[i]t is a bit late to argue that Canon I.7.4 was not effectively adopted, a quarter of a century later, and, in light of the consistent conclusions of . . . out-of-state cases that that canon is, indeed, part of the Episcopal Church's governing documents, the argument seems dubious at best. But, in any event, this is one of those questions regarding 'religious doctrine or polity' . . . on which we must defer to the greater church's resolution. . . . Over the years, the Episcopal Church has consistently taken the position that Canon I.7.4 was effectively adopted." (*Episcopal Church Cases, supra*, 45 Cal.4th at p. 492, citations omitted.) St. Luke's Parish representatives were present when the national church adopted canon I.7.4. Moreover, in 1993, St. Luke's amended its bylaws to confirm that it was an integral part of the Episcopal Church and the Los Angeles diocese and their governing documents "*now or hereafter in effect, are incorporated, by reference, in these Bylaws, as a basic and essential part hereof.*" (Italics added.) The 1993 amendment expressly embraces canon I.7.4.

To any extent the court here applied a standard deferential to the Episcopal Church rather than a neutral principles of law approach, there was no

prejudicial error because application of the latter approach would not give defendants a more favorable result. (*In re Ponce De Leon* (2004) 117 Cal.App.4th 1116, 1121 [13 Cal.Rptr.3d 310].) Under the holding of *Episcopal Church Cases*, St. Luke's Parish holds the property in question in trust for the Episcopal Church and the Los Angeles diocese, and by disaffiliating from the church, defendants and their new parish under another church have no right in the property. The individual defendants were free to disaffiliate from the national church and the diocese, but the " 'problem lies in defendants' efforts to take the church property with them. This they may not do.' " (*Episcopal Church Cases, supra*, 45 Cal.4th at p. 493, quoting *Protestant Episc. Church Diocese of N. J. v. Graves* (1980) 83 N.J. 572 [417 A.2d 19, 25]; see also *Guardian Angel Polish Nat. Catholic Church of L.A., Inc. v. Grotnik* (2004) 118 Cal.App.4th 919, 929 [13 Cal.Rptr.3d 552]; *Korean United Presbyterian Church v. Presbytery of the Pacific* (1991) 230 Cal.App.3d 480, 499 [281 Cal.Rptr. 396] (*Korean United*), disapproved on an unrelated issue in *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743, fn. 11 [29 Cal.Rptr.2d 804, 872 P.2d 143].)[4]

B

*Collateral Estoppel*

■ Defendants also contend the trial court erred by rejecting their argument the Episcopal Church and the Los Angeles diocese are collaterally estopped from claiming entitlement to the parish property since it litigated a similar issue in an earlier case and lost. Collateral estoppel, one of two aspects of the res judicata doctrine, precludes the relitigation of an identical issue necessarily decided in previous litigation. (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 828 [88 Cal.Rptr.2d 366, 982 P.2d 229].) The "collateral estoppel doctrine may allow one who was not a party to prior litigation to take advantage, in a later unrelated matter, of findings made against his current adversary in the earlier proceeding." (*Id.* at pp. 828–829.)

Defendants rely on *Protestant Episcopal Church v. Barker* (1981) 115 Cal.App.3d 599 [171 Cal.Rptr. 541] (*Barker*). In *Barker*, the court applied a neutral principles of law approach, and held that three local churches did not hold property in trust for the Episcopal Church. The court noted the local churches held record title to the properties and paid for them out of their own

---

[4] Defendants claim the grant deed to the property shows title was given to St. Luke's Parish free from any trust in favor of the Episcopal Church. The deed states: "Grantor [the bishop of the Los Angeles diocese] declares that this deed is made for the purpose of vesting legal title, now *held by him in trust for the Grantee*, in the Grantee absolute and free of any trust." (Italics added.) The term "any trust," however, is reasonably interpreted to mean the trust under which the bishop originally held the property when he received it from a private party.

funds, their articles of incorporation did not expressly alienate the properties, and they "did not subject themselves to express restraints on their property by reason of the constitution, canons, and rules of [the Episcopal Church] and the [Los Angeles] Diocese." (*Id.* at p. 625.)

■ As the court explained in *Episcopal Church Cases, supra*, 45 Cal.4th 467, however, *Barker* is distinguishable "largely due to the passage of time. In that case, the dispute arose and, indeed, the trial court judgment was rendered, before (1) the decision in *Jones v. Wolf, supra*, 443 U.S. 595, (2) the Episcopal Church adopted Canon I.7.4, and (3) the Legislature enacted section 9142, subdivisions (c) and (d). The appellate court in *Barker* did not mention any of the general church's canons. Accordingly, that decision does not control a dispute that, here, arose 25 years after the high court decision and the adoption of Canon I.7.4." (*Episcopal Church Cases, supra*, at p. 491.) Further, we now have Supreme Court precedent on the matter. "Collateral estoppel does not apply where there are changed conditions or new facts which did not exist at the time of the prior judgment, or where the previous decision was based on different substantive law." (*United States Golf Assn. v. Arroyo Software Corp.* (1999) 69 Cal.App.4th 607, 616 [81 Cal.Rptr.2d 708].)

### III

*Control of St. Luke's Parish Corporation*

■ Defendants concede the Episcopal Church and the Los Angeles Diocese "certainly may make a pronouncement that some group of individuals is the 'true' St. Luke's *Episcopal* Parish," and they "are free to decree that whomever they wish is the authorized 'Episcopal Parish' in La Crescenta." Indeed, "[i]t has long been the law in California that the identification of a religious body as the true church is an ecclesiastical issue." (*Korean United, supra*, 230 Cal.App.3d at p. 500.) California decisions on the point "are consistent with the constitutional mandate of the United States Supreme Court that civil courts may not overrule actions of authorities of hierarchical denominations with respect to matters of church polity." (*Id.* at p. 501.)

Defendants, however, contend the court erred by determining that their actions in purporting to amend the corporation's articles of incorporation and bylaws to disaffiliate St. Luke's Parish from the Episcopal Church and the Los Angeles diocese were ultra vires. Defendants complain that the ruling "vaporiz[ed] [the corporation's] board of directors and the rights of its more than 100 voting members." Defendants claim the corporation has an inde-

pendent existence from the national church and the diocese, and after the disaffiliation they lack standing to raise any issues pertaining to the corporation.[5]

We have, however, already decided the corporate control issue in favor of the national church in similar circumstances. (*Kroeger, supra,* 167 Cal.App.4th 800.) *Kroeger* arose from a dispute over the governance of St. John's Parish, which was a member of the Episcopal Church. As here, the members of St. John's Parish's clergy, members of the governing board and a majority of parish members (collectively the defendants) resigned their membership in the Episcopal Church and voted to become affiliated with an Anglican Church in Africa. The Bishop of the Episcopal Diocese of San Diego determined the remaining loyalist members of St. John's Parish (collectively the individual plaintiffs) constituted the true membership of the parish, the resigned dissident members were no longer qualified to serve as members of the governing board, and a new governing board should be elected. The individual plaintiffs elected a new board, but the resigned members of the board refused to relinquish their seats or control over the assets of St. John's Parish, which were held by a corporation known as St. John's Parish corporation (Parish corporation). (*Id.* at p. 806.)

The individual plaintiffs and the San Diego diocese filed a lawsuit under California corporations law, seeking a declaration they were the true and lawful directors of St. John's Parish. The trial court found for the defendants, but we reversed the judgment. We held that "(1) applying neutral principles of law, defendants lacked the power and authority to amend the bylaws and articles of incorporation of the Parish corporation to make it part of the Anglican Church [in Africa], and their actions in this regard are a legal nullity; (2) by taking the actions they did, defendants were no longer a part of the Episcopal Church and could not be the lawful directors; (3) we must give deference to the Episcopal Church and San Diego Diocese's determination as to who constituted the true members of St. John's Parish, and consequently the election of the individual defendants as board members of the Parish corporation was a legal nullity; and (4) applying neutral principles of law to the actions of the Episcopal Church and San Diego Diocese in determining

---

[5] As a practical matter, it appears that defendants' argument pertaining to corporate control is inextricably linked to its argument pertaining to property ownership, which we have already resolved against them. Defendants state in their reply brief that the "Diocese cannot swoop in at this point and, in hindsight, determine that some 'true church' group is entitled to control the [corporation]. Otherwise, in every local church disaffiliation, the denomination could thwart the process *and take the property* through top-down decrees." (Italics added.) Aside from the property issue, defendants do not advise us as to how the court's ruling on corporate control harms them, or of any impediment to their forming a new corporation for a parish affiliated with the Anglican Church.

who were the true members of the church, the result is the same." (*Kroeger, supra*, 167 Cal.App.4th at p. 807.)

In *Kroeger*, we explained the trial court's "fundamental mistake in deciding this matter under the neutral principles of law approach is that it believed that under this approach it was restrained to rely solely on California corporations law in a vacuum, without reference to the articles of incorporation and bylaws of the Parish corporation, as well as the constitution and canons of the Episcopal Church and San Diego Diocese, and it[] fail[ed] to recognize that religious corporations are, in their basic sense, different from ordinary corporations." (*Kroeger, supra*, 167 Cal.App.4th at p. 820.) We pointed out that "the canons of the Episcopal Church mandate that the vestry members 'well and faithfully perform the duties of that office in accordance with the Constitution and Canons of [the Episcopal] Church and of the Diocese in which the office is being exercised.' Further, the diocesan canons require vestry members to be 'qualified electors' of the Episcopal Church. In order to serve as a 'warden' of a vestry (one of a vestry's lay officers), one must be a 'communicant in good standing.' Finally, the diocesan canons provide that parishes must follow specific procedures for dissolution, which include consent of the bishop. In the event of such change, title to parish assets reverts to the diocese . . . . [¶] Thus, when defendants resigned from the Episcopal Church, they were no longer empowered to act, and their actions in attempting to amend the bylaws and articles of incorporation were a nullity. They also ceased being directors of the Parish corporation as they were not members in good standing of the Episcopal Church." (*Id.* at pp. 821–822.)

Further, the bylaws of the Parish corporation "state that the constitution and canons of the Episcopal Church shall 'always form part of the by-laws, ordinances, constitutions, and discipline of the parish; and prevail against any resolutions, by-laws, or other enactment by this parish that may appear to be repugnant to such Constitutions, Canons, Rules, Regulations, or Discipline.' The articles of incorporation similarly state that the parish church 'shall continue perpetually to be, a constituent unit or part of [the Episcopal Church,] pursuant to and in accordance with the Constitutions and Canons, rules, regulations, and disciplines of said Church . . . .' " (*Kroeger, supra*, 167 Cal.App.4th at p. 822.) We concluded, "the articles of incorporation and bylaws of the Parish corporation . . . dictate that defendants, once they resigned their membership in the Episcopal Church, were no longer members in good standing, had no power to amend the bylaws or articles of incorporation of the corporation, and, most important for this case, were no longer directors of the corporation." (*Id.* at p. 823.)

In *Korean United, supra*, 230 Cal.App.3d 480, the court also decided the corporate control issue in favor of a national church under similar circumstances. In *Korean United*, the court held, under a neutral principles of law

approach, that the attempt by a dissenting faction of a parish to amend the corporation's bylaws to sever the parish's ties with the national church was ineffective. The court explained that "[a]t that moment [of voting for disaffiliation], if not before, these members had renounced any further obligation to be subject to the doctrines or discipline of PCUSA [Presbyterian Church (U.S.A.)], and, in effect, renounced their membership in the . . . nonprofit corporation, *since its articles of incorporation required adherence to the doctrines and discipline of PCUSA as a condition of membership.* Having abandoned their membership in the . . . corporation, they lost all power and ability to determine its future status." (*Korean United, supra,* 230 Cal.App.3d at p. 506, italics added; see also *Protestant Episc. Church Diocese of N. J. v. Graves, supra,* 417 A.2d at pp. 24–25 [when persons disaffiliated themselves from the national church they automatically terminated their eligibility to hold office as wardens and vestrymen of parish].)

Here, likewise, the local church's articles of incorporation required adherence to the governing documents of the Episcopal Church and the Los Angeles diocese as a condition of membership in the corporation. The original 1940 articles of incorporation stated the corporation's purposes were to maintain a congregation of the Episcopal Church, establish and maintain a parish of the Los Angeles diocese, and hold property and transact all business related thereto "as may be prescribed by law and by the Constitutions and Canons of [the Episcopal Church]." Additionally, the articles provided that the "Constitution and Canons, rules, and regulations and discipline of the [Episcopal Church], and the Constitutions and Canons of [the Los Angeles diocese], for the time being, shall, unless they be contrary to the laws of this State, *always* form a part of the By-Laws, Ordinances, Constitution and Articles of Incorporation of this corporation." (Italics added.)

The articles of incorporation further stated that "all corporate powers shall be exercised by or under the authority of, and the temporal business and affairs of the corporation shall be controlled by, the Board of Vestrymen," and "[t]o be eligible for the position of Vestryman, a person should be a communicant of the Parish, and a recorded contributor to the financial support of the Parish." Further, the articles stated the "qualifications of members and the terms of admission to membership in this corporation are those prescribed by the Canons of the Diocese of Los Angeles for persons eligible to vote at an election of Vestrymen and Directors."

Additionally, the corporate bylaws provided that the "Constitution, Canons, Rules, Regulations and Discipline of [the Episcopal Church], and the Constitutions and Canons of the [Los Angeles diocese] *shall,* unless they be contrary to the laws of this State, *always* form part of the By-Laws, Ordinances, Constitution and Articles of Incorporation, and prevail against

anything therein contained that may appear to be repugnant to such Constitutions, Canons, Rules, Regulations or Discipline." (Italics added.) The bylaws also provided that they could be amended only by an affirmative vote of not fewer than seven vestrymen, and the article incorporating the governing documents of the Episcopal Church and the Los Angeles diocese into the bylaws "*shall not be amended unless the Canons of the Diocese of Los Angeles shall have first been amended as to said matters, and such amendment hereof shall then be in harmony with said Canons as amended.*" (Italics added.) The parish bylaws were amended in 1979, 1980 and 1993, but they continued to expressly state the parish is a constituent part of and bound by the governing documents of the Episcopal Church and the Los Angeles diocese.

Under the corporation's own governing documents, which defendants essentially ignore, their purported amendments of the articles of incorporation and bylaws to delete references to the Episcopal Church and to affiliate with the Anglican Church were ineffective. Further, under diocesan law a parish may not change its status unilaterally. Rather, the Los Angeles diocese prescribes how that may be achieved. Article XIX of its constitution governs the dissolution of a parish, for instance when a parish has "persistently disregarded or refused to conform" to any of the national or diocesan canons, and diocesan canon 3.07 provides for the reversion of a parish to "mission" status. Either event requires diocesan action.

Defendants cite section 9132 for the proposition the corporation is not subordinate to the national church or diocese, and thus the dissident faction retains control over it. The statute provides that the articles of incorporation of a religious nonprofit corporation may set forth various provisions, "which shall not be effective unless expressly provided in the articles." (§ 9132, subd. (a).) Among other things, the articles may provide that "[i]n the case of a subordinate corporation instituted or created under the authority of a head organization," "the subordinate corporation shall dissolve whenever its charter is surrendered to, taken away by, or revoked by the head organization granting it." (§ 9132, subd. (a)(2)(i).)

St. Luke's Parish, however, was incorporated in 1940, before section 9132's precursor was enacted. (*Korean United, supra,* 230 Cal.App.3d 480, 511.) In *Korean United,* the court explained: "The statutory law in 1945 did not require that such provisions [pertaining to subordination] be expressly provided in the articles; rather, such provisions were self-executing, and KUPC's [Korean United Presbyterian Church] reference to them in its articles of incorporation was all that was required to invoke their application to KUPC." (*Ibid.*) Again, the articles of incorporation here recited that the corporation would be subject to the governing documents of the national church and the diocese.

As we held in *Kroeger*, courts do not review matters pertaining to religious corporations in a vacuum, without reference to the governing documents of the local church, the national church and the diocese. The state permits the incorporation of religious bodies "only . . . as a convenience to assist in the conduct of the temporalities of the church. Notwithstanding incorporation the ecclesiastical body is still all important. The corporation is a subordinate factor in the life and purposes of the church proper. A religious corporation . . . , under the laws of this state, is something peculiar to itself. Its function and object is to stand in the capacity of an agent holding the title to the property, with power to manage and control the same in accordance with the interest of the spiritual ends of the church." (*Wheelock v. First Presb. Church* (1897) 119 Cal. 477, 483 [51 P. 841].)

Indeed, the Corporations Code defines "bylaws" of a religious corporation as including "the code or codes of rules used, adopted, or recognized for the regulation or management of the affairs of the corporation irrespective of the name or names by which such rules are designated." (§ 9150, subd. (a).) " 'This approach . . . is designed specially to permit bylaws of a religious corporation to include other types of rules and regulations to be found in various religious documents such as canons, constitutions, or rules of other religious bodies; church traditions if sufficiently ascertainable; rules of a religious superior; and similar sources.' " (*Korean United, supra*, 230 Cal.App.3d at p. 504, quoting 1B Ballantine & Sterling, Cal. Corporation Laws (4th ed. 1990) § 418.04, p. 19-493.)

Applying neutral principles of law, we conclude as a matter of law that when defendants voted for disaffiliation, they denounced their prior promises to be subject to the governing documents of the national church and the diocese, abandoned their membership in the corporation, and lost the power and authority to be directors of the corporation, as they were no longer members in good standing of the Episcopal Church. Thus, their purported amendment of the articles of incorporation and bylaws to make the corporation part of the Anglican Church were a legal nullity, or ultra vires. " ' "[U]ltra vires" refers to an act which is beyond the powers conferred upon a corporation by its charter or by the laws of the state of incorporation . . . .' " (*Sammis v. Stafford* (1996) 48 Cal.App.4th 1935, 1942 [56 Cal.Rptr.2d 589]; see 9 Witkin, Summary of Cal. Law (10th ed. 2005) Corporations, § 120, p. 896 ["*Ultra vires* acts include those beyond the powers or authorized business of the corporation under limitations in its articles . . . ."].) As there are no triable issues of material fact, summary judgment for the Episcopal Church and the Los Angeles diocese was proper.

## DISPOSITION

The judgment is affirmed. The Episcopal Church and the Los Angeles diocese are entitled to costs on appeal.

Benke, J., and McIntyre, J., concurred.

A petition for a rehearing was denied July 1, 2009, and appellants' petition for review by the Supreme Court was denied September 17, 2009, S175401.